UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                          Plaintiff

v.                                          Criminal Action No. 3:18-CR-46-3-RGJ

CHARLES CATER                                                      Defendant

* * * * *

**MEMORANDUM OPINION AND ORDER**

Charles Cater ("Cater") moves to suppress evidence and for a *Franks* hearing. [DE 140-1].  This matter is ripe. [DE 145; DE 150].  For the reasons below, the Court **DENIES** Cater's Motion. [DE 140-1].

## I.       BACKGROUND

In November 2016, the Drug Enforcement Administration's Louisville Field Division ("LFD") began investigating a "Drug Trafficking Organization ('DTO') responsible for the importation and distribution of kilogram quantities of crystal methamphetamine, heroin, cocaine and marijuana into Louisville." [DE 140-2 at 489].  Javier Rodriquez ("Rodriguez"), the alleged head of the DTO, negotiated "the price and delivery of large quantities of narcotics with multiple sources of supply." *Id.*  When the narcotics arrived in Louisville, Dwain Castle ("Castle"), another alleged member of the DTO, "distribute[d] the narcotics to lower level traffickers in Louisville." *Id.*  Rodriguez and Castle allegedly stored the narcotics at two locations: 7703 Dominique Drive and 6420 Labor Lane.  *Id.*

On January 16, 2018,[1] the LFD intercepted phone calls between Rodriguez and Vincente Ramirez ("Ramirez").  *Id.* at 490.  Ramirez and Rodriguez allegedly brokered a deal to sell a

---

[1] The LFD began intercepting and listening to Rodriquez's phone calls in December 2017. [DE 140-2 at 489].

1

kilogram of heroin to Justin Smith ("Smith") for $70,000. *Id.* When they met to do the deal, Smith and Ramirez robbed the DTO. *Id.* Over the next few days, Rodriguez made a series of phone calls in which he allegedly revealed that he intended to kill Smith and Ramirez for stealing the kilogram of heroin. *Id.* at 490-92.

On January 20, 2018, four days after the robbery, police officers "responded to a report of a shooting at 4903 Poplar Level Road on the lot of the Valero Gas Station." [DE 140-3 at 500]. When they arrived, they found Ramirez dead in his car, a handgun in his pocket. *Id.* Detective Jason Clopton ("Clopton") of the Louisville Metro Police Department investigated Ramirez's murder. *Id.* Based on his investigation and information received from a confidential informant, Clopton developed "Tookie" as a suspect in Ramirez's murder. *Id.* Clopton learned that Tookie's phone number was 502-712-xxxx.[2] *Id.*

On February 14, 2018, Clopton applied for a search warrant ordering AT&T to provide the following information for 502-712-xxxx:

> All subscriber information including name, account name, account number, home address, business address, phone number, MDS, MIN, and ESN/MEID, date of account creation and account end, current account status, types/ features of service, credit card or bank account used to pay for service, telephone/ call records, all incoming calls, all outgoing calls, call detail records, toll records, Cell tower/ site data, Per Call Measurement Data (PCMD) any and all stored locations, any and all historical locations, content of voice mail messages, header fields for text messages and voice-mail messages, including IP address for web messages and to and from numbers including content, web messages including content, and contents of any and all stored voice mail messages. Date range requested is January 16, 2018 through January 20, 2018.

*Id.* at 499.

In his affidavit, Clopton averred that "Louisville Metro Police 6th Division officers responded to a report of a shooting at 4903 Poplar Level Road. When officers arrived, they located

---

[2] Throughout this Opinion, the Court has redacted the last four digits of the phone number.

a victim suffering from multiple gunshot wounds.  The victim was in the driver's seat of the listed

truck and had wrecked in the parking lot of the location.  Victim was transported to University of

Louisville."  *Id.* at 500.  Clopton also swore that:

> Acting on the information received, affiant conducted the following investigation:
> - The victim was identified as Vincente [Ramirez] . . .
> - The victim was found inside his vehicle while driving on or in the area of Poplar Level Road.
> - When the victim was pulled out of his vehicle by LMPD officers, he was in possession of a handgun in the right side of his pants.
> - After forensically examining the victim's cell phone and cell phone records, it was determined the victim was in the area of Plane Tree Dr. and Lagoona Dr. when he called E911.
> - Detectives determined through the victim's cell phone geo-locations the victim was shot prior to arriving at 4903 Poplar Level Rd.  Detectives were unable to find the original scene of the shooting.
> - Detectives interviewed witnesses' on scene; witnesses indicated they believe the victim may have been involved in a robbery in the days prior to the murder. Witness stated his involvement in the robbery most likely be [sic] the cause of the murder.
> - Through investigative measures and the use of a reliable confidential informant (identity of confidential informant disclosed with judge) detective determined the listed cell phone number, (502) 712-[xxxx], belongs to the suspect that assaulted the victim causing death by gunshot wound.  It was learned through the use of the confidential informant the suspect's nickname is "Tookie."  It was also learned through the use of the confidential informant the suspect was given $30,000 to kill the victim over his involvement in the robbery that the victim was believed to have been involved.
> - Detective intends to use the cell phone records and geo-location records of the listed number to determine the location of the shooting, identity and location of the suspect.

*Id.*

Based on Clopton's affidavit, Kentucky District Court Judge Jessica Moore found probable

cause for the search and authorized it.  *Id.* at 501.

The LFD continued intercepting Rodriguez's phone calls.  [DE 140-2 at 492].  Rodriguez

and Castle allegedly "admit[ted] to paying 'Tookie,' who was subsequently identified through wire

interceptions and a LMPD traffic stop as Charles Cater, $30,00 to kill Ramirez and Smith."  *Id.*

After learning of Cater's "involvement," the LFD surveilled him and determined that he lived at 7619 Buena Vista Court. *Id.* at 493.

Brian Sanders ("Sanders"), a special agent with the DEA, drafted a search warrant for Cater's residence, Castle's residences, and Rodriguez's residence. *Id.* at 479; DE 140-1 at 456-57. Sanders used the same affidavit for each warrant. [DE 140-1 at 454]. The February 22, 2018 warrant for Cater's residence authorized law enforcement officers to recover these items:

> Any and all illegal drugs or controlled substances and evidence of their distribution. All evidence of money laundering to include books, records, receipts, notes, ledgers, papers, tally sheets, money counters, airline tickets, vehicle rental contracts, digital display pagers, digital beepers, speed dialers, stored electronic communication devices, cellular telephones, police radio scanners, telephone numbers of customers, suppliers, couriers, photographs and other papers or documents reflecting illegal drugs and other controlled substances distribution or transportation, money laundering, narcotics and controlled substances proceeds of said narcotic distribution, or evidence of conversion, or said proceeds such as cash or currency, jewelry, records, use of nominees, bank accounts, wire transfers, money orders, cashier checks, safety deposit box records and keys, credit card receipts, telephone toll records, telephone bills, fictitious identification, titles for all vehicles and registration thereto, records reflecting residence, any firearms and weapons which are kept for the protection of said controlled substances or proceeds . . . all in violation of Title 21 United States Code 846, 841 (a)(1).

[DE 140-2 at 481].

In support of the search warrant, Sanders submitted an eleven-page affidavit. *Id.* at 484-95. In his affidavit, Sanders described, among other things, the DTO, the conspiracy to distribute, and Cater's role in it. *Id.* Based on Sanders' affidavit, United States District Court Magistrate Judge Dave Whalin determined that there was probable cause to search Cater's residence at 7619 Buena Vista Court. *Id.* at 496. The LFD executed the search warrant and recovered multiple cell phones, marijuana, and a handgun. *Id.* at 498.

Shortly thereafter, a federal grand jury returned a two-count Indictment against Cater and his co-defendants, Rodriguez and Castle. [DE 23]. Count 1 alleges conspiracy to distribute

methamphetamine and heroin in violation of  21 U.S.C. § 841(a).  *Id.* at 33.  Count 2 alleges use, possession, or discharge of a firearm during, and in relation to, a drug trafficking crime, resulting in murder in violation of 18 U.S.C. § 924(c)(1)(A) and 924(j)(1).  *Id.* at 34.  Cater challenges the validity of the two search warrants in his case.  [DE 140-1 at 457].

## II.    DISCUSSION

Carter argues that the search warrants are invalid because the affidavits failed to establish probable cause.  *Id.* at 459.  Cater also argues that Clopton and Sanders intentionally or recklessly omitted important information from their affidavits which, if included, would have undermined the finding of probable cause.  *Id.* at 465.   Cater asks for a *Franks* hearing, to explore these omissions.  *Id.*

### A.    Validity of the Search Warrant Affidavits

#### 1.    Clopton's Affidavit

Cater argues that Clopton's search warrant is not supported by probable cause because it is not "particular" and fails to establish the informant's veracity, reliability, or basis of knowledge.  [DE 140-1 at 459-63].  The United States disagrees.  [DE 145 at 540-54].

##### a.  Particularity requirement

Cater asserts that "the affidavit is purely a speculative list of evidence that Det. Clopton hopes will be part of the records maintained by AT&T.  The list provided by Det. Clopton is a 'boilerplate' list likely used in nearly every search warrant application regarding phone number records and information."  [DE 140-1 at 463].  Cater further contends that "the warrant is facially deficient in naming a particularized place because it was issued for a property located in Florida, a property well outside the jurisdiction of the judge and law enforcement."  *Id.*  The United States

argues that "Cater cites no specific case law or rule in support of these claims.  These claims are without merit."  [DE 145 at 547-48 (internal citations omitted)].

"[T]he fact that an affidavit contains some 'boilerplate' language is not per se problematic so long as the affidavit also contains sufficient 'specificity' to satisfy probable cause." *United States v. Moore*, 661 F.3d 309, 316 (6th Cir. 2011).  "A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018).  Clopton's affidavit and warrant did just that.   In the last line of his affidavit, Clopton noted that he  "intends to use the cell phone records and geo-location records of the listed number to determine the location of the shooting, identity and location of the suspect."   [DE 140-3 at 500].  That language "served as a 'global modifier' that limited the scope of the warrant to evidence related" to the shooting. *Castro*, 881 F.3d at 965.  Clopton further "constrains the search" by limiting it to the four days before the shooting.  [DE 140-3 at 502];  *See United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006) ("'Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad'") (quoting *United States v. Ford,* 184 F.3d 566, 576 (6th Cir. 1999)).  Clopton's warrant was sufficiently particular.

The Court is likewise unpersuaded by Cater's argument that Judge Moore, as a Kentucky state court judge, lacked jurisdiction to issue Clopton's warrant for records stored in Florida.  Title 18 U.S.C. § 2703(c)(1)(A) provides that:

> A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity —
>
> (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures . . . ) by a court of competent jurisdiction[.]

Title 18 defines a "court of competent jurisdiction" as, among other things, "a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants." 18 U.S.C.A. § 2711.  As a district judge in Kentucky state court, Judge Moore was "authorized by the law" of Kentucky to issue search warrants.  *Id.*;  *See Richmond v. Com.*, 637 S.W.2d 642, 645 (1982)  ("Someone must have authority to issue warrants, and by virtue of that necessity we confirm that all district and circuit judges of this state have it");  *United States v. Master*, 614 F.3d 236, 241 (6th Cir. 2010)  ("A state is allowed to determine when a person is authorized to approve warrants, where that person has the authority to approve warrants, and what type of warrants that person is allowed to approve");  *United States v. Orisakwe,* No. 4:12-CR-265, 2013 WL 4836084, at *2 (E.D. Tex. Sept. 9, 2013), *aff'd*, 624 F. App'x 149 (5th Cir. 2015)  ("If the judicial officer signing the search warrant has authority to issue the warrant under state law, then the provisions of the Stored Communications Act have been complied with").  As a result, the warrant was properly executed under Title 18 U.S.C. § 2703(c)(1)(A).

But, even if it was not, it was objectively reasonable for Clopton to rely on it.  *See United States v. Wise*, No. 3:19-CR-22-RGJ, 2020 WL 1452727, at *2 (W.D. Ky. Mar. 25, 2020)  ("[B]ecause a district court judge has the authority to issue search warrants, it was objectively reasonable for the officers to believe that a district court judge likewise had the authority" to issue a warrant pursuant to Title 18 U.S.C. § 2703(c)(1)(A));  *See also United States v. Moorehead*, 912 F.3d 963, 969 (6th Cir.), *cert. denied*, 140 S. Ct. 270 (2019)  (applying the good-faith exception to warrant void ab initio as a result of a jurisdictional defect).

### b. Probable cause in the affidavit

Cater argues that "Det. Clopton completely excludes any information corroborated by substantial and independent police investigations.  Additionally, there are no averments about the

7

reliability of the information provided by the witnesses or of the anonymous informant in the past."
[DE 140-1 at 462].   The United States counters:  "[W]ith the confidential informant's identity
secured, vouched for as reliable, and Detective Clopton himself subject to possible prosecution if
that information was fabricated, it was reasonable for Judge Moore to find the confidential
informant as reliable."  [DE 145 at 545-46 (emphasis in original)].

When an affidavit is based in part on information provided by a confidential informant, the
court must "consider the veracity, reliability, and the basis of knowledge for that information as
part of the totality of the circumstances for evaluating the impact of that information."  *United
States v. Crumpton*, 824 F.3d 593, 615-16 (6th Cir. 2016)  (citation and quotation marks omitted).
These three factors are not evaluated independently and "more of one compensates for less of the
others." *United States v. Hines,* 885 F.3d 919, 925 (6th Cir. 2018).  As a result, the Court must
balance all potential indicia of reliability present in the affidavit.  *See United States v. Higgins*,
557 F.3d 381, 389 (6th Cir. 2009).

If "the affidavit does not aver facts showing the relationship between the affiant and the
informant, or detail the affiant's knowledge regarding the informant providing prior reliable tips
that relate to the same type of crimes as the current tip concerns," then "other indicia of reliability
must be present to substantiate the informant's statements."  *United States v. Neal*, 577 F. App'x
434, 441 (6th Cir. 2014).  But, "[t]he necessity of the affiant providing further indicia of reliability
of his or her informant has been found even in cases where the informant's identity was disclosed
to the magistrate and the statements amounted to an admission of criminal conduct."  *Id.* at 442.

Clopton's affidavit relies on information from a confidential informant ("CI").  [DE 140-3
at 500].  Clopton disclosed the CI's name to Judge Moore and stated in his affidavit, without other
explanation, that the CI is "reliable."  *Id.*  Yet, disclosure of the CI's name and a bare assertion

about reliability are insufficient alone to support a finding of probable cause. *See Neal*, 577 F. App'x at 442 ("The necessity of the affiant providing further indicia of reliability of his or her informant has been found even in cases where the informant's identity was disclosed to the magistrate and the statements amounted to an admission of criminal conduct"). For that reason, for the affidavit to establish probable cause, "other indicia of reliability must be present to substantiate the informant's statement." *Id.* at 441.

The United States asserts that "other indicia of reliability" are present: "[n]amely, comparing the independent reports from the known reliable confidential informant and the 'on-scene' witness, which corroborated one another." [DE 145 at 546]. *United States v. Higgins* is instructive. 557 F.3d at 385. There, the magistrate judge found probable cause to issue a search warrant based on the following affidavit:

> On September 9, 2005, Sgt. Carneal received information from the Henderson Police Department (Chester County) regarding a traffic stop conducted in that jurisdiction in which Officer Phil Willis of the Henderson Police Department recovered a large amount of cocaine and cocaine base. Officer Willis stated that he stopped a suspect for driving under the influence. Officer Willis informed Sgt. Carneal that the suspect had approximately 15 grams of powder cocaine, along with 26 grams of cocaine base. (Both substances field tested positive for cocaine). The suspect also had two additional passengers in the vehicle.

> All three individuals were separated and interviewed separately at the Chester County Sheriff's Department. The driver of the vehicle, whose name has been disclosed to the Judge, stated he picked up the cocaine from a location in Madison County and gave an address of 1336 Campbell Street, Apartment 5, Jackson, Tennessee, as the pick up location for the narcotics. He also identified the person selling the narcotics as Oliver Higgins.

> This information was corroborated by both passengers of the vehicle who stated they rode with the driver to the Campbell Street location. Officers from Metro Narcotics did transport the driver of the vehicle to the Campbell Street address to confirm the exact location of the transaction. Officers with the Metro Narcotics Unit corroborated the address given by the driver of the vehicle, along with the description of a motorcycle which belonged to Oliver Higgins. Officers with Metro Narcotics did identify the motorcycle as belonging to Oliver Higgins and which was located at 1336 Campbell Street, Apartment 5, Jackson, Tennessee. The driver

> stated he had purchased narcotics from this location previously and had purchased the cocaine in his vehicle on September 9, 2005 from Oliver Higgins. A check of the criminal history of Oliver Higgins showed two prior felony convictions for narcotics trafficking in Hardin County, Tennessee, in 1990 and 1998.

*Id.*

Denying the defendant's motion to suppress, the district court found that the affidavit established probable cause. *Id.* at 386. The Sixth Circuit did not. *Id.* at 390 ("[W]e conclude that the district court erred in its conclusion that this warrant was supported by probable cause"). Although the "affidavit was based on information provided to law-enforcement officers by an informant who was known to the affiant and whose name was disclosed to the issuing magistrate," it not "did not attest to the informant's reliability." *Id. at* 389. Additionally, the "'corroboration' included in [the] affidavit [did] little to reinforce the informant's assertions. The affidavit state[d] that the other passengers in the car confirmed the informant's statement," but it did "not say whether they did so unprompted or if the police asked them whether the drugs had come from Higgins's apartment." *Id.* at 390. The Sixth Circuit also reasoned that the warrant was not supported by probable cause because the affidavit did not assert that the informant "had been inside Higgins's apartment, that he had ever seen drugs or other evidence inside Higgins's apartment, or that he had seen any evidence of a crime other than the one that occurred when Higgins allegedly sold him drugs." *Id.*

Here, like in *Higgins*, Clopton provided the name of the informant to the issuing judge, but did not attest to the CI's reliability in the affidavit. [DE 140-3 at 500]. Moreover, the witnesses here, like in *Higgins*, did not provide sufficient corroboration. Clopton stated in his affidavit that the CI told him that the suspect was paid to "kill the victim over [the victim's] involvement in the robbery," but he "does not say whether [the CI] did so unprompted or if the police asked [him whether the victim was killed in retaliation for a robbery]." *Higgins*, 557 F.3d at 390; [DE 140-3

10

at 500].  Significantly, the witnesses did not corroborate the suspect's nickname, phone number, or amount Cater was allegedly paid to kill Ramirez, key information linking the murder to the suspect and the suspect to the phone number.  [DE 140-3 at 500].  And, like in *Higgins*, the affidavit here did not assert that the CI had personal knowledge of the suspect's crimes.  *Id.* As a result, under the totality of the circumstances, Clopton's affidavit did not provide probable cause for the search warrant.

### c.  *Good-faith exception*

Even though the affidavit did not provide probable cause for the search warrant, suppression is inappropriate because of the good-faith exception to the exclusionary rule.   In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court explained that evidence will not be excluded when an officer's reliance on a warrant later found to lack probable cause was objectively reasonable.  *Id.* at 922.  *Leon* identified four situations in which an officer's reliance on a later invalidated search warrant *could not* be considered objectively reasonable: 1) when the warrant is issued based on an affidavit that the affiant knows contains false information; 2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; 3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and 4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.  *Id.* at 922–23.

Cater argues that it was objectively unreasonable for Clopton to rely on the warrant because the affidavit was so lacking in indicia of probable cause that a belief in its existence was objectively unreasonable.  [DE 140-1 at 460].  The United States disagrees: "There is no evidence that Judge Moore abandoned her judicial role.  Detective Clopton's Affidavit was not bare boned and it was not so lacking in probable cause, as to render official belief in its existence entirely unreasonable."

[DE 145 at 565].   The United States also argues that "Detective Clopton acted in good faith and in reasonable reliance on a warrant" that, when issued, he "was not even required to obtain under then existing law."   *Id.* at 566.

It was objectively reasonable for Clopton to rely on the search warrant.   In his affidavit, Clopton provided first-hand information about LMPD's investigation of the shooting.   Through his investigation, Clopton determined that: 1) the victim's name was Vincente Ramirez; 2) he was "found inside his vehicle while driving on or in the area of Poplar Level Road"; and 3) he was armed with a handgun.   [DE 140-3 at 500].   Law enforcement officers forensically examined the Ramirez's phone and determined that he was not shot where they found him.   *Id.*   Witnesses provided information "that they believe the victim may have been involved in a robbery in the days prior to the murder."   *Id.*   One of the witnesses stated that Ramirez's "involvement in the robbery most likely be [sic] the cause of the murder."   *Id.*

Based on further "investigate [sic] measures" and the use of a "reliable confidential informant," Clopton also determined that: 1) "the listed cell phone number, (502) 712-[xxxx], belongs to the suspect that assaulted the victim causing death by gunshot wound"; 2) the suspect's nickname is "Tookie"; and 3) "the suspect was given $30,000 to kill the victim over his involvement in the robbery that the victim was believed to have been involved."   *Id.*

These facts are not so vague as to be conclusory or meaningless.   The affidavit was not utterly lacking in facts connecting the murder to the suspect and the suspect to the phone number. To the contrary, the confidential informant provided information about the suspect's nickname, phone number, and the amount the suspect was paid to kill Ramirez.   These facts are sufficient to establish the minimal nexus required by the good-faith exception.   *See Riley v. California*, 573 U.S. 373, 401 (2014)  ("Cell phones have become important tools in facilitating coordination and

communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals").  Finally, even if the facts in the affidavit are insufficient to establish a minimal nexus, the search warrant was issued before *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018)[3] and thus, at the time of the search, Clopton "acted in reasonable reliance on a warrant that was not even required under then-existing law."  *United States v. Britton*, 811 F. App'x 312, 316 (6th Cir. 2020).

      2.   <u>Sanders' Affidavit</u>

Cater argues that Sanders' affidavit failed "to establish a probable cause nexus between Mr. Cater's residence and why evidence for the alleged crime would be located there." [DE 140-1 at 465].  The United States disagrees.  [DE 145 at 554-66].

      *a. Nexus requirement*

A finding of probable cause requires a "nexus between the place searched and the evidence sought."  *United States v. Kenny*, 505 F.3d 458, 461 (6th Cir. 2007)  (citation and quotation marks omitted).  "The belief that the items sought will be found at the location to be searched must be supported by less than prima facie proof but more than mere suspicion."  *United States v. Bethal*, 245 F. App'x 460, 464 (6th Cir. 2007)  (citation, quotation marks, and formatting omitted).  "Neither the issuing judge nor the reviewing courts should engage in line-by-line scrutiny of the warrant application's affidavit."  *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008).  Rather, "the courts should take a totality of the circumstances approach in their review of the affidavit, and the courts may afford considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and the courts are

---

[3] In *Carpenter*, the Supreme Court held that "[t]he Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment."  *Carpenter*, 138 S. Ct. at 2220.

entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense." *Id.* (citation, quotation marks, and formatting omitted)). "A magistrate may infer a nexus between a suspect and his residence, depending upon the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." *Id.* at 687 (citation and quotation marks omitted). The determination by the issuing judicial officer is entitled to "great deference" by the reviewing court and should be scrutinized in a "realistic and common sense" manner. *United States v. Algie,* 721 F.2d 1039, 1041 (6th Cir. 1983).

The United States argues that because Cater was "a member of the DTO and participant in an 846 conspiracy, Magistrate Whalin had a substantial basis and nexus to authorize the search of Cater's residence even though, as Cater points out, the affidavit did not describe 'drug trafficking' at his residence." [DE 145 at 558]. The United States also argues that:

> The affidavit having provided Magistrate Whalin probable cause that Cater was willing to kill for Rodriguez, the leader of the DTO, when consider [sic] together with Agent Sander's knowledge of drug traffickers use of third party nominees and stash house locations to conceal evidence of their criminal activities, a reasonable inference arose that Cater's residence could be utilized by the DTO in furtherance of its criminal activities.

*Id.* at 561.

The Court agrees: Sanders' affidavit established a nexus between the evidence sought and Cater's residence. Sanders' warrant sought evidence related to a conspiracy to distribute. [DE 140-2 at 481]. "In order to sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must [prove] (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). "[P]roof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice." *United States v.*

*Avery,* 128 F.3d 966, 970–71 (6th Cir.1997)  (quoting *United States v. Pearce,* 912 F.2d 159, 161 (6th Cir.1990)).  The existence of a conspiracy "'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Id.* at 971 (citation omitted).  Once a conspiracy is shown however, a defendant's connection to the conspiracy "need only be slight." *Id.*  "Moreover, a defendant's  knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *Martinez*, 430 F.3d at 330.

Sanders' affidavit established—under the probable cause standard—both the existence of a conspiracy to distribute and Cater's involvement in it.  [DE 140-2 at 489-93].  Sanders divided his affidavit into six sections.  *Id.* at 484-95.

In "Experience and Training," Sanders described his expertise and stated that he is "familiar with the techniques and methods utilized by drug distributers." *Id.* at 484.

In "Basis for Evidence Sought in Search Warrant," Sanders swore that, among other things, "individuals engaging in drug trafficking and/or money laundering . . . utilize secondary addresses to store illegal narcotics, firearms and the proceeds from the distribution of illegal narcotics and that such addresses are referred to as 'stash locations.'" *Id.* at 486.  He also swore that such individuals "often maintain books, records, receipts, notes, ledgers, airline tickets, and money orders (in their own names, false identifies, or in the names of businesses or third-party nominees) relating to the illegal distribution of controlled substances." *Id.*

In "Background of Investigation," Sanders described the LFD's multi-year investigation of the DTO:

> 10.  In November of 2016, members of the DEA Louisville Field Division (LFD) began an investigation into a Drug Trafficking Operation (DTO) responsible for importation and distribution of kilogram quantities of crystal methamphetamine, heroin, cocaine and marijuana into Louisville, KY.

15

11.  Specifically, the LFD has identified Javier RODRIGUEZ as the leader of a DTO responsible for selling kilogram quantities of crystal methamphetamine, heroin, cocaine and marijuana.  RODRIGUEZ currently resides at 1910 Clearview Drive, LaGrange, KY.

12.  In December of 2017, members of the LFD began a series of wire and electronic interceptions over various telephones utilized by Javier RODRIGUEZ.  During the course of interception, RODRIGUEZ and his associates regularly discussed the acquisition and distribution of narcotics.  Further, the wire interceptions allowed the LFD to establish a clear and distinct hierarchy of RODRIGUEZ's DTO.  The LFD knows, based on interceptions, that RODRIGUEZ negotiates the price and delivery of large quantities of narcotics, with multiple sources of supply . . . Further, the LFD knows that CASTLE, at the direction of RODRIGUEZ, distributes the narcotics to lower level traffickers in Louisville, KY . . . RODRIGUEZ negotiates the purchase of narcotics from sources of supply in both the United States and Mexico.

*Id.* at 489-90.

In "Robbery of One Kilogram of Heroin and Subsequent Murder of Vincente Ramirez,"

Sanders provided background information on the robbery and described Cater's alleged

involvement Ramirez's murder:

13.  On January 16, 2018, members of the LFD intercepted a series of calls in which RODRIGUEZ had been contacted by an individual wo [sic] was later identified as Vincente RAMIREZ.  According to RAMIREZ, he had a third-party buyer, who was later identified as Joshua SMITH, that was willing to purchase one kilogram of heroin for the price of $70,000.  Subsequently, RODRIGUEZ and CASTLE formulated a plan to sell the kilogram to SMITH, but since SMITH was a new customer, RODRIGUEZ and CASTLE took precautions to ensure that they were not robbed by SMITH.  Ultimately, RODRIGUEZ and CASTLE met RAMIREZ, SMITH and others, in the 2100 block of West Kentucky Street.  Shortly after arrival, gunfire was exchanged.  Subsequently, the LFD, through the interception of wire communications, learned that RODRIGUEZ and CASTLE had been robbed by SMITH and his associates. Following the robbery, RODRIGUEZ made numerous calls to associates . . . and indicated that he had been involved in a 'shootout,' and had been robbed of $70,000 worth of 'china white' heroin.

. . .

18.  On or about January 19, 2018, the LFD began intercepting conversations in which  RODRIGUEZ indicated that RAMIREZ . . . had also been involved in the

16

> robbery with SMITH.  Further, RODRIGUEZ and his associates discussed killing RAMIREZ because of his suspected involvement in the robbery.
>
> . . .
>
> 20.  On January 20, 2018, RAMIREZ was shot and killed . . . in the Newburg area of Louisville.
>
> . . .
>
> 23.  Between the [sic] January 24, 2018 and February 21, 2018, members of the LFD intercepted wire communications in which RODRIGUEZ and CASTLE discuss the killing of RAMIREZ.  Specifically, RODRIGUEZ and CASTLE admit to paying "Tookie," who was subsequently identified through wire interceptions and an LMPD traffic stop as Charles CATER, $30,000 to kill RAMIREZ and SMITH . . .

*Id.* at 490-92.

Sanders also documented Rodriguez's and Castle's intercepted conversations before and after the murder, including conversations about how they did not believe that law enforcement could prove that they were involved in Ramirez's murder because "they ain't got the murder weapon" and "they ain't got no . . . phone logs."  *Id.* at 493.

Sanders also noted that, based on "historical location data" on Cater's phone, Cater, Rodriguez, and Castle were in the "same area" as Ramirez on the day Ramirez was murdered.  *Id.* at 492.  Sanders provided information connecting Cater to 7619 Buena Vista Court:

> 25.  Upon learning of CATER's involvement, members of the LFD conducted surveillance of CATER on multiple occasions.  This surveillance allowed members of the LFD to determine that CATER resides at 7619 Buena Vista Court, Louisville, KY. As recently as February 10, 2018, members of the LFD observed CATER's black Dodge 2500, bearing temporary tag, which he has been observed on multiple occasions, parked in the driveway. Additionally, a CLEAR database search has indicated that 7619 Buena Vista Court, Louisville, KY as a residence utilized by CATER.
>
> 26. Charles CATER currently lists 7619 Buena Vista Court, Louisville, KY, as his current and primary residence.

*Id.* at 493.

In "7703 Dominique Drive and 6420 Labor Lane, Louisville, KY," Sanders described the LFD's investigation of Castle's residences, and in "1910 Clearview Drive, Lagrange, Kentucky," Sanders described the LFD's investigation of Rodriguez's residence. *Id.* at 495.

Based on Sanders' affidavit, there was probable cause to believe that the DTO entrusted Cater to murder Ramirez in retaliation for Ramirez robbing the DTO of a kilogram of heroin. The DTO's ability to distribute narcotics would be hamstrung if rival drug traffickers believed they could rob the DTO with impunity. Retaliating against Ramirez—and sending a message to would-be robbers—ensured the continued success of the conspiracy to distribute. *United States v. Stanley*, No. 3:15-CR-198 (JAM), 2016 WL 7104825, at *4 (D. Conn. Dec. 4, 2016) (It is an "obvious proposition that drug dealers use violence and firearms to protect their drug trafficking activity"). Cater, a trusted member of the DTO, was tasked with protecting the DTO's ability to distribute in the future by avenging the DTO's loss of a kilogram of heroin and its proceeds. Because Sanders' affidavit established Cater's connection to and involvement in an ongoing conspiracy to distribute as an enforcer and protector of the DTO's drug distribution, it was reasonable to infer that evidence related to the conspiracy itself—the "instrumentalities and fruits" of Cater's involvement in that crime—would be found in Cater's residence. These "instrumentalities and fruits" included the things sought in Sanders' warrant: 1) firearms used to "protect" the DTO's distribution of drugs (*e.g.,* the firearm used to kill Ramirez); 2) cell phones used by the DTO to communicate about the robbery, murder, and conspiracy to distribute; 3) drugs distributed by the DTO or the kilogram of heroin that could have been recovered from Ramirez after he was murdered; and 4) drug proceeds used to pay Cater. *Williams*, 544 F.3d at 688 ("An issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence"); *See United States v. Newton*, 389 F.3d 631, 635-636 (6th Cir. 2004) ("With

continuing criminal operations, any issue of . . . the lack of a direct known link between the criminal activity and residence, becomes minimal")  (citation, quotation marks, and formatting omitted);  *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir. 2018)  ("The requirement that there be additional reason to think that evidence of the crime will be found in the criminal's residence is not as onerous as it may appear").

It is further reasonable to make this inference because it stems from Sanders' specialized training and extensive experience.  *Williams*, 544 F.3d at 686 ("[T]he courts may afford considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and the courts are entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense").  Based on his expertise, Sanders averred that DTO's, like the one allegedly operated by the co-defendants, often use "stash house locations" and "third-party nominees" to keep the "fruits and instrumentalities" of the conspiracy.  [DE 140-2 at 486].

Because Cater was a trusted member of the DTO and participant in the conspiracy to distribute, it is reasonable to infer that the DTO could use Cater's house to store evidence related to the conspiracy to distribute.  *See United States v. Anderson*, 424 F. Supp. 3d 522, 524 (W.D. Ky. 2020)  ("Full-time drug dealers obviously do not run their illegal operations from corporate headquarters registered with the Secretary of State.  They use their cars, their stash houses, and their homes. And even if a dealer keeps his drugs at a stash house, there's a better than decent chance he keeps his gun where it can best protect him (his home) and his illicit revenues where he can best protect them (also his home)");  *United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996)  (finding nexus where "[t]he affidavit . . . attested to the fact that . . . 'many drug traffickers utilize their homes to conduct their illegal narcotics trafficking activities' . . . and . . . listed several

19

items drug traffickers were likely to keep at their residences.  The affidavit further established Bogenschutz knew Ryan was arrested in connection with his companion's possession of 565 grams of cocaine and that Ryan had lied about his address in statements subsequent to his arrest"); *United States v. Benanti*, No. 315CR177TAVCCS1, 2016 WL 7079937, at *7 (E.D. Tenn. Dec. 5, 2016), *aff'd*, 755 F. App'x 556 (6th Cir. 2018)  ("The suspects also had ample opportunity to conceal instrumentalities and evidence of the crimes committed, due to their prior evasion of law enforcement . . .  [A] reasonable person could conclude that a cabin rented by the suspects, from whence they were witnessed coming and going, could have served as a likely hiding place for items used during the robberies and fruits obtained therefrom"); *See also United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986)  ("The affidavit did indicate that participants in the conspiracy maintained records regarding their activities. It is reasonable to assume that certain types of evidence would be kept at a defendant's residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence").

Cater argues that "[w]hen a warrant affidavit rests almost exclusively on the uncorroborated testimony of an informant (that did not witness any illegal activity on the premises to be subject to search) the alleged status of the defendant alone is not sufficient to connect the alleged criminal activity to the residence of the defendant." [DE 150 at 627 (citing *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)).  But, Sanders' affidavit is not based on the "uncorroborated testimony of an informant."  Rather, it is based, among other things, on the LFD's multi-year investigation of the DTO and the conspiracy to distribute, including the intercepted phone calls of Cater's alleged co-conspirators.  That said, Cater is correct that the Sixth Circuit has held—as it did in *Frazier* and more recently in *United States v. Brown*, 828 F.3d 375 (6th Cir.

2016)—that a defendant's status as a known drug dealer, standing alone, cannot create a nexus to search the defendant's residence.

In *Brown*, a jury convicted the defendant of possession with intent to distribute marijuana, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm after a previous conviction of a felony offense. *Id.* at 377.  On appeal, Brown challenged the denial of his motion to suppress evidence seized from his residence pursuant to a search warrant. *Id.* at 377-78.  The Sixth Circuit reversed the district court and held that the search warrant affidavit failed to establish a sufficient nexus because it "contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382.  Moreover, "the affidavit did not suggest that a reliable confidential informant had purchased drugs there, that the police had ever conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence." *Id.*  The Sixth Circuit noted that "[a]lthough some of these facts suggest that Brown may have been involved in the heroin drug conspiracy—and thus established probable cause to arrest Brown— they are too inconclusive to assume, for the purpose of determining probable cause to search Brown's residence, that he was a known drug dealer." *Id.* at 384.

*Brown* is distinguishable.  Unlike the affidavit in *Brown*, Sanders' affidavit established both probable cause to believe that Cater actively participated in the conspiracy to distribute and a probable cause nexus to search his residence for evidence related to it.  *Brown* is also distinguishable because the search of Cater's residence was premised on his membership in the DTO and participation in an ongoing conspiracy to distribute, not his status as a known drug dealer. Indeed, based on the affidavit, Cater's role in the conspiracy was not as a drug dealer, but as an enforcer.  [DE 140-2 at 490-93].

21

b. *Good-faith exception*

But, even if Sanders' affidavit did not establish a probable cause nexus to search Cater's residence it, at the very least, established a "minimal one." As discussed, *Leon* identified four situations in which an officer's reliance on a later invalidated search warrant *could not* be considered objectively reasonable: 1) when the warrant is issued based on an affidavit that the affiant knows contains false information; 2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; 3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and 4) when the warrant is so facially deficient that it cannot reasonably be presumed valid. *Leon,* 468 U.S. at 922–23.

The third situation is the only one that could apply here—whether Sanders' affidavit is so lacking in indicia of probable cause that it was objectively unreasonable for him to rely on it.  Such an affidavit is often called a "bare-bones" affidavit and is defined as "one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citation and quotation marks omitted).  In other words, a bare-bones affidavit is simply "a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed" and provides no more than "a mere guess that contraband or evidence of a crime would be found." *Id.* (citation and quotation marks omitted).  But an affidavit that lacks probable cause should not be confused with a bare-bones affidavit. *Id.* at 497 (recognizing that the distinction between the two "is not merely semantical" because "[t]here must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking

22

function"). When an affidavit falls short of the probable-cause standard, but still contains a "minimally sufficient nexus between the illegal activity and the place to be search," it will not be considered bare bones. *Id.* at 496-97 (quoting *Carpenter*, 360 F.3d at 596).

Sanders' warrant authorized law enforcement to search Cater's residence for evidence of the conspiracy to distribute. Sanders' affidavit, which supported it, was not bare-bones: it detailed the LFD's multi-year investigation of the DTO and the conspiracy to distribute, described Cater's role in the operation, and provided more than a "mere guess" that evidence related to the conspiracy to distribute would be recovered from Cater's house. [DE 140-2 at 484-95]. As a result, the affidavit established a "minimal nexus" to search Cater's residence.

**B.    *Franks* hearing**

A defendant is entitled to a *Franks* hearing if he: 1) "makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit"; and 2) "proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013). Warrant affidavits "carry with them 'a presumption of validity,'" and so the challenger's attack "must be more than conclusory." *United States v. Stuart*, 507 F.3d 391, 396 (6th Cir. 2007) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). That is, he must identify specific false statements and then "accompany his allegations with an offer of proof," usually in the form of supporting affidavits. *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Moreover, "[t]he movant must *also* show that the allegedly false statements were necessary for the magistrate's determination of probable cause." *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (emphasis in original). Thus, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side,

there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* (quoting *Franks*, 438 U.S. at 171–72).

The Sixth Circuit has "repeatedly held that there is a higher bar for obtaining a *Franks* hearing for an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415–16 (6th Cir. 2008). This higher standard is based on the "potential for endless rounds of *Franks* hearings due to potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks and citation omitted).  Thus, "*Franks* is generally 'inapplicable to the omission of disputed facts, except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit.'" *United States v. Shaffer*, 238 F. Supp. 3d 913, 918 (E.D. Ky. 2017), *aff'd*, No. 17-6492, 2019 WL 2929932 (6th Cir. July 8, 2019) (quoting *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998)).  "If the defendant does succeed in making a preliminary showing . . . the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists."  *United States v. Carpenter*, 360 F.3d 591, 597 (6th Cir. 2004).

1.    Clopton's Affidavit

Cater argues that Clopton intentionally and recklessly made false misrepresentations or omissions in his affidavit.  [DE 140-1 at 467].  Cater argues that, therefore, "this Court should convene an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and thereafter suppress all evidence seized from the search[] of . . . the AT&T phone number information and all evidence derived therefrom."  *Id.* at 466.  The United States disagrees.  [DE 145 at 568-73].

Cater has identified five alleged omissions from Clopton's affidavit.

### a. *Omission of statements about alternate perpetrators*

Cater asserts that "a hearing and questioning of Det. Clopton will show that these witnesses were not located or interviewed at the scene of the shooting at all.  Thus, showing the witnesses described in the affidavit did not 'witness' anything."  [DE 140-1 at 468].  Cater further claims that:

> Det. Clopton fails to provide the magistrate the information the Ramirez family passed along about who they believed killed Ramirez. They make no reference to anyone named 'Tookie.'  According to the Det. Clopton's report . . . [t]he family identifies the shooter as 'D' and the other involved to be nicknamed 'Junior.' 'Junior' is an alias that Codefendant Javier Rodriguez has been known to go-by throughout the investigation.

*Id.*

The Unites States contends that "[g]iven the context of the affidavit . . . a commonsense non-hyper technical reading can only be that the 'on-scene witnesses' provided their information to LMPD at the Valero Gas Station."  [DE 145 at 569].

The Court agrees.  The most logical reading of the sentence—"Detectives interviewed witnesses' [sic] on scene"—is that it is referring, not to where Ramirez was shot, but to where he was found.  [DE 140-3 at 500].  This reading is supported by the prior sentence in the affidavit: "Detectives were unable to find the original scene of the murder."  *Id.*  Because Clopton specifically states that they could not locate the "original scene of the murder," it is unreasonable to conclude that he was being reckless or misleading by stating the they interviewed "witnesses' [sic] on scene."

Moreover, "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information."  *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001).  Cater has failed to

make a substantial preliminary showing that Clopton omitted information he received from the Ramirez family to intentionally mislead Judge Moore.   According to the police report, two men visited the Ramirez family at their home on January 28, 2018.  [DE 140-7 at 519].  The men told the Ramirez family that "D" was the shooter and that "Junior" had "something to do with it."  *Id.* at 520. The men also told the Ramirez family not to cooperate with the police because "they planned on finding the people responsible and dealing with this themselves."  *Id.*  Clopton could have decided not to include this information in the affidavit for various reasons other than to intentionally mislead Judge Moore.  Perhaps because it was double-hearsay.  Or perhaps because the two men told the Ramirez family not to cooperate with the police because "they planned on finding the people responsible and dealing with this themselves."  *Id.*  Cater has failed to demonstrate that Clopton's decision to omit this double-hearsay originating with avowed vigilantes was done to intentionally deceive Judge Moore.

### b. Omission of information about the CI

Cater argues that Clopton omitted from the affidavit the fact that there is no corroborating evidence for the CI's statement that "Tookie" was paid $30,000.  [DE 140-1 at 469].  Cater further argues that Clopton omitted from the affidavit the CI's motive for cooperating and the "true source" of the information about "Tookie."  *Id.* at 469-70.  The United States asserts that "[e]ven if Cater's representations of the omissions are taken as true, he fails to demonstrate how they critical or exculpatory and how they make any of Detective Clopton's statements false."  [DE 145 at 572].

First, Cater has not shown that Clopton omitted information about a lack of corroboration to intentionally mislead Judge Moore.  Indeed, the absence of that information in the affidavit would lead a reviewing judge to believe that it does not exist. *See United States v. Frazier*, 423

F.3d 526, 535 (6th Cir. 2005) ("Because a judge's initial probable cause determination is limited to the four corners of the affidavit, an officer has no incentive to exclude from the affidavit information that supports a finding of probable cause") (internal citation omitted). Cater's unsupported speculation that "[i]t is highly likely that federal agents are coercing the CI to provide information in some way, such as providing the CI reduced sentence for a pending charge," is insufficient to establish that Clopton omitted this information to mislead Judge Moore. [DE 140-1 at 469]. Finally, Cater has failed to meet his burden of showing that the omission about the "true source" of the information about the suspect was done to mislead Judge Moore. Clopton avers that he disclosed the name of the CI to Judge Moore. [DE 140-3 at 500]. Thus, because Judge Moore learned the CI's identity and presumably had the opportunity to ask questions about the CI, she was not misled about the source of the information.

Second, the Court disagrees with Cater that "[s]ourcing such information in the affidavit to a 'reliable CI' could not be made without the intention to mislead a magistrate, by implicating 'Tookie' with information that was falsely sourced." [DE 140-1 at 470]. While the Court agrees that the CI's information and the information intercepted through the wire taps about "Tookie" appears to be similar, Cater has failed to make a substantial preliminary showing that Clopton intentionally misled Judge Moore about its source. Significantly, the CI provided Tookie's phone number, which appears not to have been mentioned during the intercepted phone calls. Cater offers speculation, not proof, that Clopton intentionally misled Judge Moore about the source of his information. This is insufficient to merit a *Franks* hearing. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003) (finding defendant failed to make preliminary showing that the affiant made reckless or false statements about the CI seeing drugs or money at the target

27

location, even though the defendant submitted an affidavit swearing "that he never stored drug proceeds at [the target location] and that he did not know [the CI]").

### c.   Omission of information about (502) 712-xxxx

Cater argues that "investigators found that there was no record of communication between the victim, Vicente Ramirez, and the user of (502) 712-[xxxx] . . . Such a finding weakens the already scant basis for probable cause that Det. Clopton provides."  [DE 140-1 at 470].  The United States argues that "[e]ven if Cater's representations of the omissions are taken as true, he fails to demonstrate how they critical or exculpatory and how they make any of Detective Clopton's statements false."  [DE 145 at 572].  Cater's arguments are unpersuasive.  Cater has not made a substantial showing that Clopton omitted this information to intentionally mislead Judge Moore. Even if he has, it is unclear how information about the lack of phone calls between Ramirez and (502) 712-xxxx is critical or exculpatory.  It seems unlikely that the person allegedly hired to kill Ramirez would speak with him on the phone before doing so.  Clopton requested Cater's AT&T records to "determine the location of the shooting, identity and location of the suspect."  [DE 140-3 at 500].  Information about the lack of communication between Ramirez and Tookie does not necessarily undermine probable cause to search Cater's AT&T records for historical location data.

### d.   Omissions about Title III intercepts of (502) 712-xxxx

Cater contends that Clopton "mislead[] the magistrate because he [did] not make her aware that . . . [t]he . . . intercepts of (502) 712-[xxxx] had failed to uncover any incriminating information relating to the user of (502) 712-[xxxx]."  [DE 140-1 at 471].  Cater has not made a substantial showing that Clopton omitted this information to intentionally mislead Judge Moore.  Even assuming he has, it is unclear how seemingly innocuous conversations between the user of 502-712-xxxx and Rodriguez necessarily undermines probable cause to search the phone records for

28

that phone number, especially as the CI informed Clopton that the user of that phone number was allegedly paid $30,000 to kill Ramirez.

### e. Omission of information about no drugs recovered from Ramirez's house

Cater contends that "it is significant that the search of the residence of a victim, who investigators alleged was drug trafficker doing business with the targeted DTO, and whose death was allegedly motivated by drugs, in fact found no drugs in his house." *Id.* at 471. Cater has neither alleged nor made a substantial showing that Clopton omitted this information to intentionally mislead Judge Moore.

### 2. Sanders' Affidavit

Cater argues that Sanders intentionally and recklessly made false misrepresentations or omissions in his affidavit. [DE 140-1 at 471]. Cater argues that, therefore, "this Court should convene an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and thereafter suppress all evidence seized from the searches of 7619 Buena Vista Court, Louisville, KY." *Id.* at 466. The United States disagrees. [DE 145 at 573-575].

Cater has identified four alleged misrepresentations or omissions from Sanders' affidavit.

### a. Omissions about Cater's employment by Rodriguez's company

Cater contends that "SA Sanders fails to mention, or even reference, Mr. Cater was employed by RDZ Construction, a drywalling business operated by Codefendant Rodriguez. There is critical information omitted from his affidavit misleading the reader into making a false conclusion that Mr. Cater's relationship to the codefendants is solely through the DTO as alleged." [DE 140-1 at 472]. Cater further contends that "[u]nderstanding the relationship between the codefendants is critical evaluating the existence of a nexus between the places to searched and the alleged criminal activity. Without being provided this information readily available to

investigators and SA Sanders, Sanders eliminates the judge's ability to take into consideration Mr. Cater's reasonable and legal association with his codefendants." *Id.* at 472-73.

Citing *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998), the United States asserts that Cater's "argument runs counter to Sixth Circuit case law." [DE 145 at 573]. The Court agrees. Cater has not made a substantial showing that Sanders omitted this information to intentionally mislead Magistrate Whalen. Even if he has, it is unclear how this information is critical or exculpatory. Sanders swore in his affidavit that the LFD intercepted phone calls in which Rodriguez and Castle discussed paying Cater $30,000 to murder Ramirez. [DE 140-2 at 492]. Working for Rodriguez's construction company does not undermine the probable cause in the affidavit to believe that Cater was a member of the DTO and involved in the conspiracy to distribute. Indeed, additional information about Cater's relationship with Rodriguez arguably strengthens probable cause to believe he was a member of the DTO. *See Strickland*, 144 F.3d at 416 ("To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur").

### b. Omission of individual identities

Cater argues that "[d]espite having identified some of the individuals present during key events, SA Sanders, groups them together in his affidavit as 'associates,' 'other members of the DTO.' 'and others,' etc. This is misleading to the reader and misrepresents the facts by generalizing the identities of participants in the key relating events of the case." [DE 140-1 at 473]. Cater further argues that this failure to identify individuals is especially problematic in relation to the robbery of the DTO: "Investigators conducted surveillance on the transaction, in

which SA Sanders was listed as witness . . . SA Sanders omitted the specific identities of parties

who participated in the drug deal and mislead the magistrate to thinking Mr. Cater was there." *Id.*

The United States disagrees.  [DE 145 at 573-74].  Cater has not made a substantial showing that

Sanders omitted this information to intentionally mislead Magistrate Whalen.  Even if he has, it is

unclear how this information is critical or exculpatory.  The Court also disagrees with Cater's

interpretation of the affidavit.  Based on the plain language of the affidavit, there is no implication

that Cater was involved in the robbery:

> 13.   On January 16, 2018, members of the LFD intercepted a series of calls in which RODRIGUEZ had been contacted by an individual wo [sic] was later identified as Vincente RAMIREZ.  According to RAMIREZ, he had a third-party buyer, who was later identified as Joshua SMITH, that was willing to purchase one kilogram of heroin for the price of $70,000.  Subsequently, RODRIGUEZ and CASTLE formulated a plan to sell the kilogram to SMITH, but since SMITH was a new customer, RODRIGUEZ and CASTLE took precautions to ensure that they were not robbed by SMITH.  Ultimately, RODRIGUEZ and CASTLE met RAMIREZ, SMITH and **others**, in the 2100 block of West Kentucky Street.  Shortly after arrival, gunfire was exchanged.  Subsequently, the LFD, through the interception of wire communications, learned that RODRIGUEZ and CASTLE had been robbed by SMITH and his associates.  Following the robbery, RODRIGUEZ made numerous calls to associates . . . and indicated that he had been involved in a 'shootout,' and had been robbed of $70,000 worth of 'china white' heroin.

[DE 140-2 at 490 (emphasis added)].

Cater argues that the use of the term "others" is misleading.  But, at this point in the

affidavit, Sanders had neither mentioned Cater nor linked him to the DTO, so it is unreasonable to

believe that "others" referred to Cater.  Indeed, based on the word's placement in the sentence, it

likely referred to associates of Ramirez and Smith, especially as a few sentences later Sanders

wrote that "RODRIGUEZ and CASTLE had been robbed by SMITH and his associates." *Id.*

### c.  Omissions about the historical location data on Cater's phone

Cater argues that Sanders intentionally mislead Magistrate Whalin by stating that

Rodriguez, Castle, and Cater were in the "same area" as Ramirez on the day of the shooting, but

31

not providing "information about how the phone or how the phone's relating [sic] number was connected to Mr. Cater." [DE 140-1 at 474]. The United States disagrees. [DE 145 at 574]. Cater has not made a substantial showing that Sanders omitted this information to intentionally mislead Magistrate Whalen. Even if he has, it is unclear how information this information is critical or exculpatory. Cater argues that "[f]or the magistrate to be able to review the 'totality of the circumstances' the magistrate must have a basic understanding of the limited accuracy of the location data in both time and area." [DE 140-1 at 475]. But, nothing about Sanders' statement that Cater was in the "same area" as Rodriguez, Castle, and Ramirez would mislead Magistrate Whalin into thinking that the LFD could pinpoint their exact location. *See Strickland*, 144 F.3d at 416.

#### d. Misrepresentations about Rodriguez and Castle's conversations about Cater

Cater argues that "Sanders is presenting the cited intercepted conversations of Mr. Cater's codefendants in a way that blatantly mispresents the facts. He uses an overly broad span time to imply the frequency conversations and therefore the veracity of their contents. However, he only points to a single conversation relating to the payment of "Tookie," thus, evidencing his intentional, or at least reckless, disregard for the truth." [DE 140-1 at 477]. The United States disagrees. [DE 145 at 574-75].

Cater has failed to make a substantial preliminary showing that the Sanders knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit. But, even he has, he has not proven that the false statement or material omission is necessary to the probable cause finding in the affidavit. While it may not be clear based on the affidavit how many times Rodriguez and Castle discussed Cater's involvement, it is clear that they discussed paying him $30,000 to murder Ramirez. [DE 140-2 at 492]. Some vague

language in the affidavit does not undermine probable cause to believe that, based on Rodriguez's and Castle's own words, they paid Cater to kill Ramirez. *Id.*; *See Illinois v. Gates*, 462 U.S. 213, 235 (1983) (Affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area") (citation and quotation marks omitted).

### III.   <u>CONCLUSION</u>

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED that** Cater's Motion [DE 140-1] is **DENIED** as set forth above.  This matter is set for an in-person status conference for both Cater and Rodriguez on **January 26, 2021 at 1:30 p.m.** at the Gene Snyder United States Courthouse before the Honorable Rebecca Grady Jennings, United States District Judge.

Cc:     Counsel of record