UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                      PLAINTIFF


v.                                    CRIMINAL ACTION NO. 3:18-CR-00046-RGJ


**JAVIER H. RODRIGUEZ**                                       DEFENDANTS
a/k/a JUNIOR
**CHARLES O. CATER**
a/k/a TUKI
a/k/a BLACK

### UNITED STATES
### TRIAL MEMORANDUM
### *Electronically Filed*

Comes now the United States of America, by counsel, and submits the following Trial

Memorandum, in accordance with the trial Order of the Court [DN 197 as modified by Text Order

220].

**(a) STATUTES INVOLVED**

**Count 1:**
**Title 21 U.S.C. § § 846 and 841(a)(1) – (Rodriguez and Cater)**

The defendants knowingly and intentionally conspired to possess with intent to distribute

controlled substances, as defined by Title 21 ,United States Code, Section 812, including: fifty

(50) grams or more of methamphetamine, a Schedule II controlled substance; one (1) kilogram

or more of a mixture and substance containing heroin, a Schedule I controlled substance; 400

grams or more of a mixture and substances containing a detectable amount of N-phenyl-N-[(1-

(2-phenethyl)-4-piperidinyl] propanamide, commonly known as "fentanyl", a Schedule II

controlled substance; and less than fifty (50) kilograms of a mixture and substance containing a

detectable amount of marijuana, a Schedule I controlled substance, all in violation of Title 21,

United States Code, Section 841 (a)(l).

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

*Elements*

(A) First, that two or more persons conspired, or agreed, to possess with the intent to distribute controlled substances.

(B) Second, that the defendants knowingly and voluntarily joined the conspiracy.

**Count 2:**
**Title 18 U.S.C. § § 924(c)(1)(A) and 924(j)(1) and 2– (Rodriguez and Cater)**

The defendants knowingly used or carried a firearm, during and in relation to a drug trafficking crime, for which they may be prosecuted in a court of the United States, that is, conspiracy to distribute controlled substances, as charged in Count 1 of the Superseding Indictment in violation of Title 21 , United States Code, Section 846; and in so doing, they caused the death of a person, V.R., through the use of the firearm in such a manner as to constitute murder, as defined by Title 18, United States Code, Section 1111, in that the defendants did unlawfully kill the victim with malice aforethought.

*Elements Aiding and Abetting*

(A) First, that the crime of using or carrying a firearm during and in relation to a drug trafficking crime was committed.

(B) Second, that the defendant knowingly used or carried a firearm, or that the defendant helped to commit or encouraged someone else to commit the crime of using or carrying a firearm during and in relation to a drug trafficking crime.

(C) Third, that the use or carrying of the firearm was during and in relation to, or that the defendant intended to help commit or encourage the crime of using or carrying a firearm during and in relation to, a drugtrafficking crime. The defendant intended to aid and abet the crime of using or carrying a firearm during and in relation to a drug trafficking crime if he had advance knowledge that an accomplice would use or carry a firearm during the commission of a drug trafficking crime. Advance knowledge means knowledge at a time the defendant can attempt to alter the plan or withdraw from the enterprise. Knowledge of the firearm may, but does not have to, exist before the underlying crime is begun. It is sufficient if the defendant gained the knowledge in the

2

midst of the underlying crime, as long as the defendant chose to continue to participate in the crime and had a realistic opportunity to withdraw. You may, but need not, infer that the defendant had sufficient foreknowledge if you find that the defendant chose to continue his participation in the crime after the defendant knew an accomplice was using or carrying a firearm.

(D) And fourth, that the defendant caused the death of a person through the use of the firearm.

**Count 3:**
**Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2 – (Rodriguez)**

The defendant knowingly possessed with the intent to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, as defined by Title 21, United States Code, Section 812.

*Elements*

(A) First, the defendant knowingly possessed a controlled substance.

(B) Second, the defendant intended to distribute a controlled substance.

*Elements Aiding and Abetting*

(A) First, that the crime of possession with intent to distribute a controlled substance was committed.

(B) Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime.

(C) And third, that the defendant intended to help commit or encourage the crime.

*Elements Causing an Act*

(A) First, that the defendant caused another  to commit the act of possession with intent to distribute a controlled substance.

(B) Second, if the defendant or another person had committed the act it would have been the crime of possession with intent to distribute a controlled substance.

(C) And third, that the defendant willfully caused the act to be done.

**Counts 4:**
**Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2 – (Rodriguez)**

The defendant knowingly possessed with the intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N-[(1-(2-phenethyl)-4-piperidinyl] propanamide, commonly known as "fentanyl", a Schedule II controlled substance, as defined by Title 21, United States Code, Section 812.

*Elements*

(A) First, the defendant knowingly possessed a controlled substance.

(B) Second, the defendant intended to distribute a controlled substance.

*Elements Aiding and Abetting*

(A) First, that the crime of possession with intent to distribute a controlled substance was committed.

(B) Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime.

(C) And third, that the defendant intended to help commit or encourage the crime.

*Elements Causing an Act*

(A) First, that the defendant caused another to commit the act of possession with intent to distribute a controlled substance.

(B) Second, if the defendant or another person had committed the act it would have been the crime of possession with intent to distribute a controlled substance.

(C) And third, that the defendant willfully caused the act to be done.

**Counts 5:**
**Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2 – (Rodriguez)**

The defendant knowingly possessed with the intent to distribute forty (40) grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[(1-(2-phenethyl)-4-piperidinyl] propanamide, commonly known as "fentanyl", a Schedule II controlled substance, as defined by Title 21, United States Code, Section 812.

*Elements*

(A) First, the defendant knowingly possessed a controlled substance.

(B) Second, the defendant intended to distribute a controlled substance.

*Elements Aiding and Abetting*

(A) First, that the crime of possession with intent to distribute a controlled substance was committed.

(B) Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime.

(C) And third, that the defendant intended to help commit or encourage the crime.

*Elements Causing an Act*

(A) First, that the defendant caused another to commit the act of possession with intent to distribute a controlled substance.

(B) Second, if the defendant or another person had committed the act it would have been the crime of possession with intent to distribute a controlled substance.

(C) And third, that the defendant willfully caused the act to be done.

**Count 6:**
**Title 18 U.S.C. § 922(g)(1)—(Cater)**

The defendant knowingly possessed, in and affecting commerce a firearm and ammunition with knowledge he had previously convicted of a felony crime.

_Elements_

(A) First: That the defendant has been convicted of a crime punishable by imprisonment for more than one year.

(B) Second: That the defendant, following his conviction, knowingly possessed a firearm or ammunition.

(C) Third: That at the time the defendant possessed the firearm or ammunition, he knew he had been convicted of a crime punishable by imprisonment for more than one year.

(D) Fourth: That the specified firearm or ammunition crossed a state line prior to the alleged possession. It is sufficient for this element to show that the firearm

**Count 7:**
**Title 18 U.S.C. § 1512(b)(1) and (k)-- (Cater)**

The defendant knowingly and intentionally conspired with others to attempt to intimidate, threaten, and corruptly persuade another person with intent to influence, delay, and prevent testimony in an official proceeding.

_Elements_

(A) The defendant used intimidation_;_ threatened another person_;_ corruptly persuaded another person; engaged in misleading conduct toward another person or attempted to do so; or conspired to do so, and

(B) The defendant acted knowingly; and

(C) The defendant acted with the intent to influence, delay or prevent the testimony of any person in an official proceeding.

**(b) STATEMENT OF FACTS**

In November of 2016, members of the DEA Louisville Field Division (LFD) began an investigation into a Drug Trafficking Organization (DTO) responsible for the importation and distribution of kilogram quantities of crystal methamphetamine, heroin, fentanyl, cocaine, and marijuana into Louisville, KY.

The evidence at trial, including wire and electronic interceptions, will show that Javier H. Rodriguez, a citizen of Mexico and unlawful alien, was the leader of a DTO operating in the Western District of Kentucky, whose primary role was to negotiate the price and delivery of large quantities of narcotics with multiple sources of supply, including sources from Mexico, and negotiate sales and collection of money from various customers.  Dwain C. Castle, a convicted felon, was identified as Rodriguez's "right-hand man" and stash house operator who stored and transported the DTO's narcotics and cash to and from multiple locations. Charles O. Cater, also known as "Tuki", a convicted felon, was identified as a member of the DTO who assisted the DTO, and when necessary, acted as a bodyguard and enforcer when violence was required on behalf of the organization.

The DTO used in person meetings and cell phones to communicate with one another and narcotic supply chain associates both up and downstream from the DTO in furtherance of their conspiracy.  The DTO would operate by arranging and receiving large supplies of controlled substances, often covertly transported hidden inside of vehicles.  The DTO would store the controlled substances at stash locations and then distribute to local associates.  The DTO would distribute the controlled substances by "fronting", a buy now pay-later method, or payment on delivery.  Once the money was collected the DTO would send payment back its source of supply.

The evidence at trial will show the lengths the DTO went to protect their drug trafficking activities from law enforcement detection as well as from individuals who would seek to harm their organization.

To avoid law enforcement detection, Rodriguez operated his DTO under the cover of a construction company doing business within the Western District of Kentucky.  Rodriguez "employed" both Castle and Cater as employees of his construction business, which lent the DTO

the appearance of legitimacy as they conducted their drug trafficking activities. Additionally, to protect the DTO, members would actively attempt to conceal evidence of their crimes and routinely "drop" cell phones, disguise ownership of cell phones, conduct counter surveillance, use coded language; including nicknames, use multiple vehicles, attempt to identify law enforcement informants, and discuss law enforcement activities, including the arrests of DTO associates and their court status.

To protect the DTO and its assets, the DTO would attempt to disguise or conceal individual members and their connection to the DTO, stash locations, and members' home residences. The DTO referred to this a being a "ghost", with the concept being to stay behind the scenes and not draw too much attention for fear of, not just law enforcement detection, but concern for theft and robbery. In low-risk situations, such as dealing with known trusted associates, individual members of the DTO would meet with an associate. In high-risk situations, however, such as dealing with new customers, multiple members of the DTO would be involved for protection in numbers, which would include Rodriguez, Castle, and Cater. The DTO also used firearms for protection and sought to maintain a tough reputation to dissuade the appearance of weakness that would invite individuals to "get over on" or take advantage of the DTO.

On January 16, 2018, in furtherance of their drug trafficking conspiracy, Rodriguez, Castle and Cater arranged a drug deal and met a potential customer to sell a kilogram of heroin for $70,000. As part of this transaction V.R. (a.k.a. "Migo"), a longtime Rodriguez associate, organized the deal acting as a middleman between the DTO and new potential buyers. Prior to the deal, Rodriguez, Castle, Cater, and V.R. met at a DTO stash location collected the kilogram of heroin and then traveled to the established drug deal location. The drug deal, however, turned out to be a setup for a robbery. The "customers" robbed the DTO at gun point of the heroin. During

8

the robbery gunfire was exchanged, no one was injured but the heroin was stolen.  Rodriguez, Castle, Cater, and V.R. all fled the scene.  The DTO immediately began attempting to identify and locate the robbers so they could recover their heroin and seek retribution. The DTO identified J.S. as being involved in the robbery and began planning his murder which would both exact revenge and satisfy the DTO's debt to the source of supply for the stolen heroin.  Despite the longtime connection to V.R., over time the DTO began to suspect V.R. was invovled in the robbery and planned his murder.

On January 20, 2018, the DTO executed its plan and V.R. was shot to death.  The DTO lured V.R. to a specific location under the false pretense that V.R. would be supplied with marijuana to sell on behalf of the DTO as means of recompense for the stolen heroin.  Rodriguez, Castle, and Cater traveled together to the neighborhood of the meet location.  Once in the neighborhood, Cater was let out of Rodriguez's vehicle and he approached V.R., who was waiting parked in his vehicle to receive the marijuana.  Cater then shot V.R. multiple times causing his death. Rodriguez, Castle, and Cater then fled the scene together in Rodriguez's vehicle and discarded the murder weapon.  Following the murder, the DTO also discarded some of the cell phones they were currently using and acquired new ones.

Following V.R.'s murder the DTO, while extremely mindful of law enforcement investigative efforts, continued its drug trafficking activities and continued to actively pursue J.S. for involvement in the robbery.  Rodriguez and Castle discussed by phone the risks to the DTO and payment to Cater for the murder of V.R.  Cater used his payment to purchase a Dodge truck from the car lot at which Witness 1 worked.  During this time, law enforcement furthered its investigation of the DTO and on February 23, 2018, arrested Rodriguez, Castle, and Cater and executed multiple search warrants at various locations associated with the DTO.  At the time of

Cater's arrest, law enforcement recovered two cell phones from his person.  Examination of one of the phones revealed that Cater was discussing a murder for hire arrangement with Witness 1[1]. For thirty thousand dollars Cater would kill an individual Witness 1 believed sexually assaulted a family member.  Discussions between Witness 1 and Cater regarding this murder for hire took place over an extended time period and were close in time to the murder of V.R.

On the same date, law enforcement recovered from Cater's residence marijuana, additional cell phones and a firearm[2].  Cater, in the presence of law enforcement called his wife and admitted to possession of the marijuana and firearm.  Law enforcement also executed search warrants of DTO locations controlled by Rodriguez and Castle and recovered controlled substances, firearms, ammunition, cell phones, cash, and other items indicative of the DTO's drug trafficking conspiracy.

While detained on bond and awaiting trial, Cater enlisted family members to confront Witness 1 for the purpose of corruptly persuading Witness 1's testimony at trial regarding knowledge of Cater's involvement in the DTO and Cater's involvement in the murder for hire scheme.

At trial this evidence will be established by recorded phone calls, surveillance, business records, autopsy report, firearm examinations, cell phone examinations, controlled buys, search warrants, physical evidence, location data related to cell phones, and expert and lay witness testimony.

## (c) STATEMENT OF UNRESOLVED SUBSTANTIVE ISSUES OF LAW

---

1 Witness 1 is the same individual noted in Count 7 of the Superseding Indictment. DN 175.
2 This firearm was excluded as the firearm used to murder V.R.

Defendant Cater has filed a motion to sever his case from the codefendant Javier Rodriguez [DN. 162]. The United States has objected to the motion for severance [DN. 169]. The Court has not ruled on this motion.

Defendant Cater has filed a motion to dismiss Count 2 of the Indictment [DN. 157] and a motion to dismiss the Superseding Indictment [DN. 198].  The United States has objected to the motions [DN. 203]. The Court has not ruled on these motions.

The United States has filed two motions *in limine*: 1, to admit defendant Cater's post *Miranda* statements for impeachment [DN. 239] and 2, to admit defendant Cater's recorded admissions to his wife [DN. 240]. There has been no defense response to date. The Court has not ruled these motions.

## (d) EVIDENTIARY ISSUES

### Rule 404(b) Evidence

The United States may introduce additional evidence that is part of the *res gestae* of the case and not 404(b) evidence, but in the abundance of caution, we provide notice of this as well:

- Evidence that at the time of the murder of V.R., Cater was involved in another murder for hire scheme with Witness 1.  For payment of thirty thousand dollars Cater would murder an individual identified by Witness 1.

Rule 404(b) states in pertinent part:

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404.

The United States intents to use this evidence to prove motive, intent, preparation, plan, knowledge, and identity.  A key issue at trial will be the identity of the individual who shot V.R. The Sixth Circuit has found that "[p]rior acts or crimes can be admitted to show identity,

provided they are "of sufficient distinctive similarity" with the charges in the indictment to "create a pattern or modus operandi." *United States v. Perry,* 438 F.3d 642, 648 (6th Cir.2006) (noting that "[i]t is not necessary ... that the crimes be identical in every detail"); *see also United States v. Mack,* 258 F.3d at 554 (6th Cir 2001) (noting that "standard conduct, although not particularly unusual by itself, may, in combination, present an unusual and distinctive pattern constituting a 'signature'")". *United States v. Allen*, 619 F.3d 518, 524 (6th Cir. 2010).

Here, in addition to the conscious and intentional steps the DTO took to conceal their identities and connection to their conspiracy, including the homicide of V.R., Cater has identified his codefendant Castle as the actual shooter.  Thus, the identity of the shooter will be at issue, and therefore, evidence of Cater's involvement in the murder for hire is appropriate under 404(b), even if this evidence is not considered to be *res gestae* and admissible on its own pursuant to Rule 403.  *See United States v. Allen*, 619 F.3d 518, 524 (6th Cir. 2010) ("As in previous cases admitting evidence to show identity, these prior acts are of sufficient distinctive similarity with the charges in the indictment to "create a pattern or modus operandi" and, therefore, to help identify that it was Allen, not Officer Goodine, who possessed and discarded the crack cocaine at the scene. Therefore, these acts were admissible for a proper purpose under Rule 404(b).").

*Summary Charts*

The United States intends to use summary charts detailing and organizing the government's evidence.  *See* Fed. R. Evid. 1006; *See also United States v. Scales*, 594 F.2d 558 (6th Cir. 1979); *United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998); *Epstein v. United States*, 246 F.2d 563 (6th Cir. 1957); *Barber v. United States*, 271 F.2d 265 (6th Cir. 1959); *United States v. Bartone*, 400 F.2d 459 (6th Cir. 1968); *United States v. Rath*, 406 F.2d 757 (6th Cir.

1969). Specifically, summary charts will be used to show the following: Phone number association charts; call frequency charts, focused call frequency charts; cell phone mapping presentation; and cell phone location charts (pings). All of the supporting records and data were either provided in discovery or have been made available for review at the United States Attorney's Office.

*Jenks Materials*

All witness interviews and grand jury testimony will be turned over to defendants before trial begins.

*Evidence of Potential Penalty is Not Relevant*

The defendants are precluded from introducing evidence or commenting in any way about the potential penalty each would face upon conviction. Courts have long held that the question of punishment should never be considered by a jury in a criminal case. *United States v. McDonald*, 935 F.2d 1212, 1222 (11th Cir. 1991). "It is axiomatic that it is the exclusive function of juries to determine whether defendants are guilty or not guilty, and of the Court to determine matters of punishment." *United States v. Davidson*, 367 F.2d 60, 63 (6th Cir. 1966). (Citing *Sullivan v. United States*, 317 F.2d 101, 102 (5th Cir. 1963)).

Section 8.05 of the Sixth Circuit Pattern Criminal Jury Instructions, current through October 1, 2021, makes it clear that any decision regarding punishment in a criminal case is the province of the trial judge, not the jury. In *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999), the Sixth Circuit Court of Appeals characterized as "without merit" Bilderbeck's argument that he should be able to cross examine his drug supplier, who was cooperating with the

government, about the supplier's cooperation in other cases and the federal penalties Bilderbeck

potentially faced so as to allow comparison of the penalties Bilderbeck potentially faced with the

penalty received by the supplier.

Therefore, any evidence, question, or argument regarding penalty would be improper and

thus inadmissible.

*Voice Identification Recorded Calls*

Through direct and circumstantial evidence, the government can sufficiently establish the

authenticity of its voice identifications on the wiretap recordings and transcripts.  The

authenticity of the government's voice identifications may be analyzed under Fed. R. Evid. 901.

Rule 901(a) requires that evidence be authenticated or identified as a condition precedent

to admissibility.  This requirement "is satisfied by evidence sufficient to support a finding that

the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The government

"need only make a prima facie showing of authenticity" to satisfy Rule 901(a).  *United States v.*

*Black*, 767 F.2d 1334, 1342 (9th Cir. 1985). An opinion identifying a person's voice—whether

heard firsthand or through mechanical or electronic transmission or recording—based on hearing

the voice at any time under circumstances that connect it with the alleged speaker. Voice

identification need only meet a "low bar of minimal familiarity." *United States v. Cruz-Rea*, 626

F.3d 929, 935 (7th Cir. 2010) (authenticating officer listened to a fifteen second exemplar).

Suggestive voice identifications may be challenged on due process grounds. See, e.g., *United*

*States v. Rice*, 607 F.3d 133, 142 (5th Cir. 2010) ("[f]or a particular identification to violate due

process, it must be 'so impermissibly suggestive as to give rise to a very substantial likelihood of

irreparable misidentification.'") (quoting *Roper v. Beto*, 454 F.2d 499, 502 (5th Cir. 1972);

*United States v. Recendiz*, 557 F.3d 511, 527-28 (7th Cir. 2009) ("[a] witness's voice identification is subject to the same due process analysis as other forms of identification."). When the speaker's identity is at issue, "[t]he standard for the admissibility of an opinion as to the identity of the speaker is merely that the identifier has heard the voice of the alleged speaker at any time." *United States v. Cooke,* 795 F.2d 527, 530 (6th Cir.1986) (quoting *United States v. Rizzo,* 492 F.2d 443, 448 (2d Cir.1974)). To identify the voices on the CD, the government offered the testimony of a detective with the Richland County Sheriff's Department as well as an officer with the Ohio Adult Parole Authority. Both witnesses identified the voices on the CD as belonging to Simms and his girlfriend based on prior conversations that the officers had with the two. Simms claims this identification was not sufficient because the witnesses had last heard the voices when the case was under investigation, which was two years before the trial. But this argument lacks merit because the Federal Rules of Evidence allows voice identification by someone who became familiar with the voice *at any time* and does not place a time limitation on the familiarity. Fed.R.Evid. 901(b)(5) (emphasis added). Taken as a whole, the district court did not abuse its discretion in admitting the CD into evidence. *United States v. Simms*, 351 Fed. Appx. 64, 69 (6th Cir. 2009). Additionally, "[g]enerally, self-identification by the person who was called at a telephone number where that individual would be expected to be is sufficient to authenticate the call, when there is no probable motive for fraud." Joseph W. Cotchett, *Federal Courtroom Evidence* § 901.4.6 (5th ed. 2003); *see, e.g., United States v. Roberts*, 22 F.3d 744, 754 (7th Cir. 1994) (authentication was proper where speaker identified himself to investigator after investigator asked hotel operator to connect him with the speaker).

*Audio Recordings*

15

For audio recordings to be admissible, the district court must be satisfied as to the general trustworthiness of the recording, and a proper foundation must be established either through chain of custody or testimony establishing the accuracy of the evidence. *United States v. DeJohn,* 368 F.3d 533, 542–43 (6th Cir.2004). We have previously upheld the admission of copied audio recordings where a proper foundation was laid as to the copies' accuracy and authenticity. *See, e.g., DeJohn,* 368 F.3d at 543 (upholding admission of copied tape recordings where a witness testified as to the process used to obtain the wiretap, monitor the conversations, log the results, and copy portions from the original); *United States v. Segines,* 17 F.3d 847, 854 (6th Cir.1994) (upholding admission of a composite tape where a witness testified as to how the composite was made). In this case, the computer specialist from the Richland County Sheriff's Department testified about the process used to record inmates' conversations and to copy Simms's conversations from the jail's server. In addition, a detective with the Sheriff's Department identified Exhibit 3 as being a copy of the CD copied from the jail's server. While the testifying detective was not present when Exhibit 3 was made, he identified the handwriting on the front of the CD as belonging to that of the captain who made the copy, and he testified that he listened to the first copy and portions of the second copy. Simms claims that this testimony is not sufficient because the captain who copied the CD did not testify and the audio recordings could have been altered during copying. This argument, however, does not implicate the CD's admissibility but instead goes to the weight that should be attributed to it. *United States v. Allen,* 106 F.3d 695, 700 (6th Cir.1997).*United States v. Simms*, 351 Fed. Appx. 64, 68 (6th Cir. 2009)

_Transcripts_

16

Recordings are generally admissible unless the incomprehensible portions of the recordings are so substantial as to render the recordings as a whole untrustworthy. *United States v. Terry*, 729 F.2d 1063, 1068 (6th Cir. 1984). The decision to admit recordings into evidence rests with the trial court. *United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979). Such recordings must be authentic, accurate, trustworthy and sufficiently audible and comprehensible for the jury to consider the contents. *See United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). *See also United States v. Elder*, 90 F.3d 1110, 1129-30 (6th Cir. 1996); *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994); *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994).

If the conversations are in a foreign language, use English language translations. *See United States v. Chavez-Alvarez*, 594 F.3d 1062, 1069 (8th Cir. 2010) ("it is well settled that juries may use translated transcripts of recorded conversations during trial and deliberations"). It is appropriate to admit the English language translations as the primary evidence to be considered by the jury. *See United States v. Estrada*, 256 F.3d 466, 472-73 (7th Cir. 2001) (trial court did not abuse its discretion by admitting translated transcripts but refusing to play original Spanish language recordings to provide "tone and inflection" context); *United States v. Sanchez-Gonzalez*, 294 F.3d 563, 567 -68 (3d Cir. 2002) (trial court did not abuse its discretion by admitting translated transcripts where defendant had the opportunity to correct any transcript errors). The English language translation may be introduced without introducing the recordings themselves. *Estrada*, 265 F.3d at 473. If the case involves recordings in a foreign language and English transcripts are provided to the jury, *see United States v. Garcia*, 20 F.3d 670, 672-73 (6th Cir. 1994), *citing United States v. Moreno*, 933 F.2d 362, 375 (6th Cir. 1991) and *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985).

On whether transcripts can be used by the jury during deliberations, the Sixth Circuit has allowed such use. *See Scarborough, supra* at 1024-25 (transcripts can be used in deliberations, even if transcripts not admitted into evidence, as long as court instructs that the recordings and not the transcripts are evidence) (*citing* United States v. Puerta Restrepo, 814 F.2d 1236, 1242 (7th Cir. 1987)). While the Committee takes no position on whether transcripts should go to the jury room, if they do, the court should instruct the jury again that the recordings are the evidence rather than the transcripts.

<u>*Chain of Custody*</u>

If the exhibit is susceptible to tampering or contamination, "chain of custody" evidence is needed to show that substitution, tampering, or contamination is improbable. *United States v. Jones*, 356 F.3d 529, 535 (4th Cir. 2004). In most cases, defects in the chain of custody go to the weight, not admissibility. *See United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010) ("it does not appear that there was anything improper about Officer Hixon's replacement of the original evidence bag, and Agent Montejo provided several explanations for the decrease in weight [of the crack cocaine]"); *United States v. Rawlins*, 606 F.3d 73, 84-85 (3d Cir. 2010) (presumption of regularity covers defects in cocaine chain); *United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008) (affirms the admissibility of drugs with a foundation patched together from past recollection recorded and the presumption of regularity). "There is no rule that the prosecution must produce all persons who had custody of the evidence to testify at trial." *Cardenas,* 864 F.2d at 1532.

"Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury." United States v. Fluker, 698 F.3d 988, 999 (7th Cir. 2012). A proponent "is not required to rule out all

possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." Achey v. BMO Harris Bank, N.A., 64 F.Supp.3d 1170, 1175 (N.D. Ill. 2014).

### Internet maps

Professional looking maps can be created from Internet sources such as Google Maps, Google Earth, MapQuest, and Bing Maps. The maps may properly be the subject of judicial notice. *See, e.g., Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177, n. 3 (7th Cir. 2013) ("[w]e have taken judicial notice of—;and drawn our distance estimates from—;images available on Google Maps, 'a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining' general distances." (quoting *United States v. Perea-Rey*, 680 F.3d 1179, 1182, n. 1 (9th Cir. 2012)).

### Spoilation Concealment of Evidence

Spoilation of evidence is admissible to show consciousness of guilt. The fact that a defendant attempts to fabricate or conceal evidence indicates a consciousness that his case is weak and from that the defendant's guilt may be inferred. *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *United States v. Franks*, 511 F.2d 25, 36 (6th Cir. 1975). It has been held to be reversible error for the court to instruct that such evidence might be considered evidence of guilt rather than evidence of "consciousness of guilt."

### (e) POTETNIAL TRIAL PROBLEMS

### Witness Logistics

The United States intends to call dozens of witnesses, including expert coders and physicians who reviewed materials in this case. Given the volume of witnesses in this case,

19

schedules are unpredictable.  Although the United States will do its best to keep witnesses flowing, there may be disruption in the flow of witnesses based on schedules.

## (f) JURY INSTRUCTIONS

The government's proposed jury instructions and proposed verdict form have been submitted in a separate document.

## (g) PROPOSED VOIR DIRE QUESTIONS

1.  The Defendants are represented by the flowing attorneys:
    JAVIER H. RODRIGUES- David Lambertus and Keith Kamenish
    CHARLES O. CATER – Johnathan Ricketts

    Does any member of the panel recognize the defendants or the attorneys representing them?

    If so, would that affect your ability to be a fair and impartial juror in this case?

2.  Assistant United States Attorneys Mac Shannon and Rob Bonar represent the United States in this case.

    Do any of you know either of these attorneys?

    If so, would that affect your ability to be a fair and impartial juror in this case?

3.  Also sitting at the United States' table is HHS Special Agent Sheila Green.

    Do any of you know SA Green?

    If so, would that affect your ability to be a fair and impartial juror in this case?

4.  This is a criminal case.  Do any of you have any moral, religious or philosophical beliefs that would prohibit you from being a fair and impartial juror in this case?  In other words, does anyone have a problem with sitting in judgment of another person?

5.  In federal court, the jury decides whether the defendant is guilty or not guilty, and punishment, if any is to be imposed, is determined by the Court.  Does anyone have a

problem with this proposition?  With this aspect of our court system in mind, would each of you be able to consider the facts of the case and render a verdict without concern for what punishment, if any, would later be imposed?

4.      Do any of you believe that the possession of firearms should be legalized under all circumstances? Does anyone believe convicted felons should be allowed to have firearms?

5.      Do any of you support the legalization of any currently controlled substances?  If so, do any of you belong to any organizations that advocates such legalization?

6.      This case was investigated by members of multiple state and federal law enforcement agencies.  Has anyone had any negative contact with any law enforcement agency, whether it be personally or through a close friend?  Does anyone hold any negative views of law enforcement officers in general?

7.      How many of you regularly watch cop shows on t.v. like "C.S.I." or "Law and Order"? Asking you if you understand that those shows are fiction and this is real, would insult your intelligence and that is not my purpose.  However, I want to ask some questions about expectations.  Many times those t.v. shows feature a scientific test that solves the case or a witness who confesses on the witness stand.  Do any of you expect to hear those types of evidence?  The judge will instruct you on the elements of each offense.  Those are the facts that the government must prove to you beyond a reasonable doubt.  That is the burden. Will any of you hold the government to a different burden based on your expectations or require them to prove to you something that is not in the instructions.  In other words, can you convict someone if the government has proven all the elements of the crime, but has not proven something else, something about which you may be wondering?

8.      That brings me to the burden of proof.  You'll hear that the government has the burden of

proof and the standard it has to meet is proof beyond a reasonable doubt. That doesn't mean that they have to prove the case beyond all doubt, just that which is reasonable. Does anyone have a problem with that?

9.    There are two types of evidence, direct and circumstantial. Direct evidence can be physical evidence such as a gun or some drugs. It can also be testimony. Circumstantial evidence is evidence that requires jurors to draw an inference from a set of facts. For example, if you go to bed at night and there is no snow on the ground, but when you wake up in the morning, the ground is covered with snow, your observations are circumstantial evidence that it snowed during the night. Does everyone understand that the law has no preference for either type of evidence and doesn't presume that one is better than the other? Does anyone have a problem with that?

10.    How many of you have been on a jury before? How many reached a verdict? What was it?

11.    Have you or anyone in your family or a close friend ever received any legal training, practiced law, or worked in an attorney's office?

12.    If selected as a juror in this case, do you understand that any personal feelings you may have must be set aside if they conflict with the law as the Court will instruct you?

13.    Have you or anyone close to you ever been investigated, arrested or convicted of a non-traffic related violation of state or federal law?

14.    Do any of you have difficulty hearing, seeing or sitting for long periods of time?

15.    Do any of you have events going on in your lives that would distract your attention from the testimony and evidence of this case?

16.    Do any of you know one another? If so, would you be influenced by the opinions or beliefs

of the person you know?

17.    Is there anything that I haven't asked you that might affect your ability to be a fair and impartial juror or might limit your ability to give your full attention to this case?

## (h) EXHIBIT LIST AND STIPLUATION AS TO AUTHENTICITY

Will advise the Court upon consultation and confirmation from defense consul.

## (i) PROPOSED WITNESS LIST

The government's proposed Witness List has been submitted in a separate document for the Court's *in camera* review.

The government may be able to reduce the number of witnesses depending on the stipulations reached with opposing counsel prior to trial.  Due to the complexity and length of the case, the government reserves the right to call additional witnesses not currently on the list as their relevance becomes necessary during trial.  Additionally, defense counsel has been provided with notice of the government's intention to call expert witnesses, those witness' qualifications, and a summary of the issues and testimony that will be addressed.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

Mac Shannon
Robert Bonar
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky 40202

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_____
Mac Shannon
Assistant United States Attorney